1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10
11
12
13
14
15
16

| | |
|---|---|
| THE BILL & MELINDA GATES FOUNDATION, a charitable trust organized under the laws of the State of Washington,<br><br>                                    Plaintiff,<br><br>     v.<br><br>SAAMA TECHNOLOGIES, INC., a Delaware corporation,<br><br>                                    Defendant. | No.<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br><br><br>Demand for Jury Trial |

17
18
19
20
21
22
23

The Bill & Melinda Gates Foundation (the "Gates Foundation") brings this action for breach of contract, fraud, negligent misrepresentation, professional negligence, unjust enrichment, trademark infringement under the Lanham Act (15 U.S.C. § 1114), false advertising under the Lanham Act (15 U.S.C. § 1125(a)), and unfair business practices under the Washington Consumer Protection Act (RCW 19.86.010 *et seq.*) against Saama Technologies, Inc. ("Saama" or "Defendant").

24
25
26

The Gates Foundation alleges the following based upon personal knowledge with respect to its own acts and the acts of its employees, and upon information and belief as to all other matters. The Gates Foundation's information and belief is based on the investigation of

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 1

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

the undersigned counsel, K&L Gates LLP, which included review and analysis of (i) written correspondence between the parties; (ii) materials prepared by Saama and delivered to the Gates Foundation; (iii) interviews with relevant Gates Foundation employees; and (iv) interviews with former Saama employees (each identified herein as a Confidential Witness ("CW")).  Counsel's investigation is continuing; many of the relevant facts are known only by Saama or are exclusively within its custody or control.  The Gates Foundation believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE CASE

1.      This is a civil action for damages brought against Saama for breach of contract, fraud, negligent misrepresentation, professional negligence, unjust enrichment, trademark infringement under the Lanham Act (15 U.S.C. § 1114), false advertising under the Lanham Act (15 U.S.C. § 1125(a)), and unfair business practices under the Washington Consumer Protection Act (RCW 19.86.010 *et seq.*).

2.      The claims arise first out of Saama's false representations to the Gates Foundation about the state of its services and capabilities and its failure to deliver any working product to the Gates Foundation, despite billing the Gates Foundation more than $2.8 million over 18 months.

3.      The claims arise also from Saama's misuse of the Gates Foundation's protected name and marks to deceptively advertise Saama's services.  Saama's actions violate the parties' contract, infringe on the Gates Foundation's federally protected marks, and violate the Washington Consumer Protection Act.

## II.    JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the Gates Foundation's Lanham Act claims pursuant to 15 U.S.C. § 1121  and 28 U.S.C. § 1338(a).

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 2

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

5.       This Court has supplemental jurisdiction over the Gates Foundation's pendent state law claims pursuant to 28 U.S.C. § 1367 in that the state law claims are integrally interrelated with the Gates Foundation's federal claims and arise from a common nucleus of operative facts, such that the administration of the Gates Foundation's state law claims with its federal claims furthers the interest of judicial economy.

6.       In the alternative, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1).  There is complete diversity between the Gates Foundation and Saama, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.       This Court has personal jurisdiction over Saama because it conducted business with the Gates Foundation in Washington and traveled to Washington as part of the events or omissions giving rise to the claims.

8.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.       THE PARTIES

### A.       Plaintiff

9.       The Gates Foundation is a private philanthropic foundation headquartered in Seattle, Washington, that employs more than 1,000 people.  Its founding principle is that all lives have equal value.  The Gates Foundation and its employees dedicate their time and resources to improving the quality of life for individuals around the world.

10.       To achieve this broad goal, the Gates Foundation pairs with partner organizations worldwide and tackles critical problems in four program areas: (1) Global Development, which works to help the world's poorest people lift themselves out of hunger and poverty;  (2) Global Health, which aims to harness advances in science and technology to save lives in developing countries; (3) U.S. Programs, which seeks to improve U.S. high school and postsecondary education and support vulnerable children and families in

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

Washington state; and (4) Global Policy & Advocacy, which builds strategic relationships and promotes policies that will advance the Gates Foundation's work.

11.    In order to maximize its positive global impact, the Gates Foundation has committed to becoming increasingly transparent, and it has sought to disseminate and share high-quality data with the public for the public good.    The Gates Foundation embraces transparency because access to information and data fosters effective collaboration and can lead to better insights for the benefit of all.

12.    The Gates Foundation has also searched for opportunities to help the philanthropic sector become more transparent, so that other philanthropic organizations can improve their global impact.

**B.    Defendant**

13.    Defendant Saama is a Delaware corporation headquartered in Campbell, California.  It claims to be "a leading data science solutions services company delivering a new class of flexible and Fluid Analytics hybrid solutions" to its customers.[1]  Saama advertises that it can provide a business analytics solution that is "specific" to its customer's "industry, business, data, domain, and time."[2]  Saama was retained by the Gates Foundation in August 2015. As part of this engagement, Saama traveled to and worked in Seattle, Washington.

**IV.    FACTUAL ALLEGATIONS**

**A.    Overview of the Saama-Gates Foundation Relationship**

14.    The Gates Foundation manages a significant amount of internal and external data related to its operations and its four program areas.

---

[1] Saama Technologies, Inc. About Us, (accessed September 21, 2017 at 9:00AM), https://www.saama.com/about-us/who-we-are/

[2] Saama Technologies, Inc. Why Saama, (accessed September 21, 2017 at 9:00AM), https://www.saama.com/the-saama-difference/why-saama/

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

15.     Over the past few years, the Gates Foundation has made a significant effort to disseminate data to grantees, nonprofits, and the public at large—all as part of its goal to promote transparency, collaboration, and more informed decision-making.

16.      The Gates Foundation has also worked to make sure its own internal decisions are supported and informed by good data, wherever possible.

17.     Saama claims that it can develop customized tools for entities desiring to use business analytics to make data-based decisions.  "Business analytics" generally refers to the process of using data, statistics, and technology to explore and analyze past performance and to make future decisions based on data-derived information.

18.     In August 2015, the Gates Foundation and Saama entered into a Master Service Agreement (the "MSA").

19.     The Gates Foundation engaged Saama because Saama promised that it could assess the Gates Foundation's analytics strategy and ultimately build a functional business intelligence, data, and analytics platform for the Gates Foundation (the "Platform").   The Gates Foundation hoped to implement this program internally and, eventually, to use it to manage data from four program areas.

20.     The MSA set forth the general terms governing the parties' relationship and allowed the Gates Foundation to issue work orders for different phases of the Platform project (the "Work Orders").

**B.      Phase 0: Saama Conducts an Assessment and Recommends a Saama-Developed Platform.**

21.     Saama represented to the Gates Foundation that, as a first step, it needed to assess the Gates Foundation's current data and analytics strategy.  The Parties referred to this assessment step as "Phase 0."

22.     At the end of Phase 0, Saama was to make recommendations for implementing a program that could better track, organize, and use internal Gates Foundation data.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

23.     The Parties understood that, based on Saama's recommendations, the Gates Foundation would then issue work orders for Saama to create the software that would implement Saama's recommended Platform.

24.     Saama represented to the Gates Foundation that Phase 0 was a legitimate assessment upon which the Gates Foundation should base its work orders.  But according to former Saama employees, Saama recognized internally that the assessment step was primarily a sales opportunity to secure future work orders from its client.

25.     For example, according to CW1, a Big Data/Analytics Lead, a certain segment of the Saama's sales force involved in setting up the scope and pricing of projects routinely fails to involve the company's delivery teams to determine whether what had been represented to customers can actually be delivered.  CW1 describes these individuals as high-level employees who are "running the show."

26.     CW1 further explained that these sales employees commit Saama to projects without knowing whether they are feasible and that, as a result, "a lot of bizarre situations" emerge, including "bad deliverables."

27.     CW1 notes that Saama's failure to involve its delivery team during the setup phase is **not** typical within the industry.  CW1 suggested that Saama's failure to follow best industry practices is the result of poor leadership.  In particular, CW1 identified the former Vice President of Saama's delivery team, who had "no clue" how to use Saama's talent or to address the delivery problems.

28.     According to CW1, rather than hold the sales team accountable for their misleading statements, Saama would use "dirty tricks" to blame others for the delivery problems that emerge.  The Saama employees assigned to these problematic projects are often pressured by Saama to leave.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 6

**K&L GATES LLP**
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

29.     CW1 estimated that Saama had delivery problems on roughly 20% to 25% of its engagements, which CW1 attributed directly to Saama's sales (i.e., assessment and recommendation) model.

30.     At no time did Saama inform the Gates Foundation that roughly 20% to 25% of its engagements result in delivery problems.  Nor did Saama give any indication to the Gates Foundation that it was exaggerating or misrepresenting its capabilities.  Rather, Saama put forward an impressive team for the assessment that seemed capable at the time of performing the services discussed.

31.     Saama completed its Phase 0 assessment and, as anticipated, on October 28, 2015, gave a presentation to the Gates Foundation with a plan outlining its recommendations and next steps.

32.     Saama's recommended next steps involved a series of subsequent phases, referred to as Phase 1a, Phase 1b, Phase 2, Phase 3, and Phase 4.  Saama represented that it had the capability to build the recommended Platform as outlined for each phase.

33.     Saama promised that the Platform would "deliver operations and financial reporting needs of the Gates Foundation," provide a "blueprint for scaling and growing program analytics," allow users to "gain[] insights across multiple data sets—including internal (contracts, budgets, etc.) and external (population, public health, social sentiment and so on)," and provide "sandbox, cataloging, sharing, and collaboration capabilities across distributed global teams."  Saama also promised that the Platform would keep data secure at all stages, from "sourcing," to "landing," to "access services."

34.     The Gates Foundation's role was to provide Saama with the information, such as data sheet sets and budgets, necessary to create a functioning Platform, which it did.  The Gates Foundation's role was not to build the Platform or develop any of the software.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 7

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

**C.**     **Bait and Switch: Saama Replaces its Original Team with Developers Who Lack Basic Knowledge and Experience.**

35.     During its October 2015 presentation to the Gates Foundation, Saama represented that Phases 1a and 1b would be completed and "go live" by June 28, 2016.  Phase 1 would create programs for four areas: (1) Financial systems; (2) Investments; (3) Budget; and (4) Domain data.

36.     Following the presentation, and before development work began, Saama replaced its original team with an entirely new team of employees.

37.     The Gates Foundation was surprised that Saama would replace its original team, but it was assured by Saama that the new team included experienced experts and was capable of performing the tasks and meeting the delivery dates for Phase 1a and Phase 1b on time.  However, this representation was false.

38.     For example, according to CW2, a Business Analyst assigned to the Gates Foundation Project, Saama misrepresented CW2's skills to the Gates Foundation by claiming CW2 was a "Data Profiling Expert."  CW2 alerted Saama management that they were not an expert in this area and, in fact, had no experience or background in the data profiling field whatsoever.  Nevertheless, Saama continued its misrepresentation and assigned CW2 to the Project in this capacity.

39.     When CW2 realized this, they attempted to obtain training from Saama in Data Profiling.  In response to CW2's request, Saama provided CW2 with nothing more than a 75-page document that had been prepared for a different Saama client and that contained no specific Data Profiling training.

40.     Later in the Project, Saama again approached CW2 and asked CW2 to misrepresent their experience and skills.  This time, Saama attempted to represent that CW2 was an expert in "Master Data Management."  Again, CW2 informed Saama management that they had no experience in this area and would need training.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

41.     Saama did not correct its misrepresentations to the Gates Foundation.

**D.     Constant Turnover:  Saama's Misrepresentations Continue as its Team Members Working on the Gates Foundation Project Repeatedly Change.**

42.     In March 2016—two months before the Platform's expected go-live date—Saama communicated to the Gates Foundation that, due to "issues" with the Platform, Saama would need to extend the delivery date to July 2016.

43.     Also in March 2016, Saama again changed out the Saama team members, while continuing to misrepresent its developers' expertise and experience.

44.      For example, in order to develop a program that combined financial data in useful ways, the Phase 1 developers would have needed to understand how to interpret budgets and balance sheets.  But Saama's developers lacked even this basic understanding.

45.     Indeed, several times in or around March 2016, members of the Gates Foundation had to explain the basic mechanics of a balance sheet to the Saama developers working on the Platform.

46.     In addition to lacking this basic understanding, Saama's developers were wholly unfamiliar with how to develop the Platform's MicroStrategy component.

47.     Part of Phase 1's implementation involved building the Platform in a way that would allow the Gates Foundation to use a program called MicroStrategy to access and present data.

48.     Saama falsely claimed that it was capable of building out the Platform's MicroStrategy component.

49.     In a presentation to the Gates Foundation, Saama presented mock-up slides showing how the MicroStrategy component might be used.  During this meeting, one member of the Gates Foundation asked to see a demonstration by Saama using the MicroStrategy software.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

50.     The Saama presenter then admitted that he did not have MicroStrategy on his computer and further admitted that he had never personally used MicroStrategy, despite Saama's representing him as the MicroStrategy expert.

51.     After learning that Saama's developers did not know how to use the program, or even have the program installed on their computers, the Gates Foundation insisted that Saama bring in someone with relevant experience.  Eventually, Saama replaced its developer with a MicroStrategy expert, a contractor.  However, Saama's developers continued to work on the semantic layer of the Platform and experienced additional problems.

52.     In June 2016, Saama again switched the development team working on the Gates Foundation project, while continuing to misrepresent its developers' experience.

53.     On June 27, 2016, Saama told the Gates Foundation that it could not meet its July delivery date.  Saama then promised that the Phase 1 would be complete in August 2016.

54.     Saama did not complete Phase 1 in August, and it again delayed the launch to September 2016.

55.     In early September 2016, Saama told the Gates Foundation that it expected the project to be complete by late September or early October.

**E.      Saama Eventually Launches a Beta Version of Some of the Software in October that Fails to Meet Even the Most Basic Requirements.**

56.     To help Saama deliver something of value, the Gates Foundation reduced the scope of Phase 1 several times, and it gave up altogether on Phases 2-4.

57.     Phase 1 was reduced drastically; instead of integrating data from four areas (Financial Systems, Investments; Budget, and Domain Data), Saama agreed to focus on just the Financial Systems component.

58.     Even with the reduced scope, Saama was unable to deliver a working product that kept financial-systems data secure on all levels, as promised.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 10

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

59.     Saama produced a beta version of the reduced-scope Financial Systems Platform in October 2016.

60.     This version was unusable for all but a handful of Gates Foundation employees, because Saama developers had been unable to create a program that kept sensitive financial data, such as employee salaries, medical leave, and benefits, secure.

61.     In addition, the Gates Foundation alerted Saama about a bug in the beta software in October 2016, shortly after the beta version launched.  Saama assured the Gates Foundation that it could fix this bug in 48 hours.  But by February 2017, the bug had still not been fixed, rendering a large part of the product completely unusable.

**F.      The Gates Foundation Attempts to Confront Saama About its Problems.**

62.      Throughout the project, the Gates Foundation held weekly meetings with Saama project leaders regarding the status of the Platform.   In these meetings, Saama continued to misrepresent the nature, scope, and gravity of the issues that plagued its attempt to build the Platform and the experience of its team.

63.     The Gates Foundation also met with key members of Saama leadership to address the status of the project.  One Saama program manager agreed with the Gates Foundation that Saama had brought in the "wrong team" and assured the Gates Foundation that the project status would improve with a new team.  It did not.

64.     Eventually, after seeing no improvement, in September 2016, the Gates Foundation escalated its concerns to the highest level of Saama leadership: Saama's Chief Executive Officer, Suresh Katta.  Mr. Katta apologized for Saama's repeated failures and promised to correct the Platform issues by bringing in more experienced team members.

65.     Assured by these representations from Saama's CEO, the Gates Foundation continued to work with Saama and chose not to terminate its contract.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 11

66.     Nevertheless, Mr. Katta's representations did not lead to improved results.  In late September 2016, Saama once again changed its delivery date to December 2016.

67.     By early December, it became clear to the Gates Foundation that Saama, in spite of its continued assurances, including assurances from its CEO, could not meet the December date.  The Gates Foundation began to search elsewhere for a development team that could deliver something of value.

68.     By January 2017, Saama yet again missed the Phase 1 delivery date.

**G.      The Gates Foundation Terminates the Saama Contract and Hires a Competent Third Party to Develop the Platform.**

69.     In February 2017, after trying to work with Saama for a year and a half, the Gates Foundation terminated the MSA for cause.  At that point, Saama was nearly a year behind schedule, even though the Gates Foundation had drastically reduced the scope of the project in an effort to help Saama deliver something useful.

70.     Section 12 of the MSA states:

[T]he Services will be performed in a good and workmanlike manner consistent with industry standards . . . and [] the Services will be free from material defects in workmanship and shall be fit for their intended uses.

71.     The Gates Foundation alerted Saama that it had violated Section 12 of the MSA and that, as a result, the Gates Foundation was terminating the contract for cause.

72.     At the time the contract was terminated, approximately 90% of Saama's software code was nonfunctional or unusable.   Saama's product was so full of material defects that it had to be scrapped entirely.

73.      The Gates Foundation hired a third party, North Highland Company, to build the recommended Platform.  To date, the Gates Foundation has had to pay North Highland Company and other third-party contractors roughly $710,000 to address and remedy Saama's failures.  Unlike Saama, North Highland Company was able to build a functional product and did so swiftly.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 12

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

74.     In addition, the Gates Foundation's own personnel have spent roughly $700,000 of employee time working to remedy issues caused by Saama.

75.     The Gates Foundation paid Saama approximately $2.8 million.  This money was paid after Saama misrepresented its capabilities.  In exchange for the $2.8 million, the Gates Foundation received a non-functional product that could not even keep basic sensitive data secure.

### H.     The Gates Foundation Discovers, *after Terminating Saama for Cause*, Saama's Unauthorized Use of the Gates Foundation Name and Marks in Advertising to Mislead and Induce Sales to Additional Customers.

76.     Today, Saama continues its deceptive business practices by using the Gates Foundation name and marks deceptively and without authorization in a manner that suggests that the Gates Foundation endorses Saama, in order to advertise Saama's services to other unsuspecting customers.

77.     Section 11 of the MSA states:

> You must obtain the Gates Foundation's prior written approval before: (a) issuing a press release or other public announcement regarding the Services, this Agreement, or a Work Order; and (b) any other public or promotional use of the Foundation's name or logo (including email signatures, business cards, client lists, letterhead, etc.).  Please email your request to: communicationsservicedesk@gatesfoundation.org.

78.     This provision in the MSA survives termination of the contract.

79.     Saama has never requested the Gates Foundation's approval to use the Gates Foundation name or logo.  Had such approval been requested, it would have been refused.

80.     The Gates Foundation has discovered several instances where Saama has used the Gates Foundation name in press releases and advertisements, including on the main pages of Saama's website.[3]  Screen captures from the Saama website illustrating this misuse are provided on the next page:

---

[3] *See* Saama Technologies, Inc. Why Saama, (accessed September 21, 2017 at 9:00 AM), https://www.saama.com/the-saama-difference/why-saama/ama; *see also* Saama Technologies,

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 13

Secure | https://www.saama.com/wp-content/uploads/2016/07/Saama_Insurance_Claims_and_Fraud_Case_Study.pdf

Claims and fraud: a case for data science in human behavior patterns                    2 / 2

Enterprise Analytics lead

machine learning.

## Key Business Outcomes

The Claims team at the insurer was ecstatic. What would have been a multi year project was implemented successfully in half the expected time.

**The key benefits were:**

**Speed of implementation**
- Aggregated Enterprise datasets in eight weeks rather than the traditional six months
- Claims fraud Operationalization in ten weeks

- More accurate fraud detection, which leads to better customer experience and higher retention
- Up to 20 percent improvement in settlement time and 15 percent reduction in fraudulent claims
- Lifting of Validated Claims Fraud Flags from 3.7 percent to 8.1 percent
- Potential for 2.2 percentage points Loss Ratio improvements within twelve months

## About Saama

Headquartered in Silicon Valley, Saama is the leading Big Data solutions company delivering Analytics Advantage to Global 2000 clients. Our Fluid Analytics™ hybrid solutions maximize existing customer infrastructure, allowing us to focus on the white space between existing capabilities and the critical business questions that need to be answered. We are unique in our ability to drive the rapid adoption of advanced analytics into company-specific business processes in a matter of weeks. Saama has broad experience in industries such as life sciences, healthcare, insurance, financial services, CPG, high-tech and media. Clients include Actelion, Bill and Melinda Gates Foundation, Brocade, Broadcom, Cisco, CSAA Insurance Group, Dignity Health, GoPro, Motorists Insurance Group, Otsuka, PayPal and Unilever.

---

https://www.saama.com/about-us/who-we-are/

saama    Solutions    Saama Difference    Customers    Partners

Our Fluid Analytics solutions maximize existing customer infrastructure, allowing us to focus on the white space between existing capabilities and the critical business questions that need to be answered.

We are unique in our ability to combine our Fluid Analytics Engine orchestration with our vertical industry expertise to drive the rapid adoption of advanced analytics into company-specific business processes in a matter of weeks. Saama has broad experience in projects including visualization, MDM, Hadoop, cloud and other advanced analytics solutions, in industries such as life sciences, healthcare, insurance, financial services, CPG, high-tech and media.

Clients include Actelion, Bill and Melinda Gates Foundation, Brocade, Broadcom, Cisco, CSAA Insurance Group, Dignity Health, GoPro, Motorists Insurance Group, Otsuka, PayPal and Unilever.

---

Inc. About Us, (accessed September 21, 2017 at 9:00 AM), https://www.saama.com/about-us/who-we-are/

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 14

81. Saama has also allowed its investors to use the Gates Foundation's name and mark to advertise Saama in press releases.[4]  A screen capture is provided below:



82.   Saama's use of the Gates Foundation's name and mark not only violates the parties' agreement; in addition, it misleads potential customers.  The Gates Foundation terminated the MSA for cause after Saama charged it millions but failed to deliver anything of value.  In using the Gates Foundation's name, Saama is misrepresenting its relationship with the Gates Foundation and continuing to employ deceptive business practices.

## V.  CLAIMS FOR RELIEF

### Count I
### Breach of Contract

83.   The preceding paragraphs are incorporated by reference.

84.   Saama and the Gates Foundation entered into a binding contract in August 2015.  Both parties had an opportunity to negotiate the terms of the contract and to obtain legal advice prior to its execution.

---

[4] *See* Carrkick Capital Partners, Saama Announces Fluid Analytics for Life Sciences, (September 21, 2017 at 9:10AM), http://carrickcapitalpartners.com/saama-announces-fluid-analytics-for-life-sciences-orchestration-stack-for-fastest-impact/

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 15

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

85.     The Gates Foundation performed each and every contractual obligation required of it.

86.     Saama failed to perform its obligations in a "good and workmanlike manner" as required by the MSA.  Saama thereby breached the contract.

87.     Saama failed to perform its services in a "manner consistent with industry standards" as required by the MSA.  Saama thereby breached the contract.

88.     Saama failed to provide a product "free from material defects in workmanship" as required by the MSA.  Saama thereby breached the contract.

89.     Saama did not obtain the Gates Foundation's permission before using its name or marks in Saama's advertisements, press releases, and publications, as required by the MSA. In this respect as well, Saama breached the contract.

90.     As a result of Saama's breaches, the Gates Foundation has suffered substantial losses. The Gates Foundation gave Saama approximately $2.8 million and received nothing of value in return.

91.     The Gates Foundation has spent approximately $710,000 hiring third parties to perform Saama's obligations. In addition, the Gates Foundation has lost at least $925,000 in employee time as a result of Saama's breaches.

92.     The Gates Foundation is entitled to an injunction that prohibits Saama from using the Gates Foundation name and mark in Saama publications or on the websites of Saama and its affiliates.

93.     The Gates Foundation is also entitled to compensatory damages in an amount to be proven at trial.

**Count II**
**Fraud**

94.     The preceding paragraphs are incorporated by reference.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

95.     Saama misrepresented its employees' skills and experience to secure and keep the Gates Foundation as a customer.  Saama made these misrepresentations with the intent to secure more work orders and to prevent the Gates Foundation from terminating the parties' contract.

96.     For example, Saama falsely represented that its employees were experts in areas where they had no training or experience.  These misrepresentations were material.

97.     Saama knew that these representations were false.  Employees told Saama that these representations were false.  Saama failed to correct these false representations or inform the Gates Foundation that they were false.

98.     Saama intended for the Gates Foundation to act on these misrepresentations by keeping Saama as a contractor.  Saama wanted the Gates Foundation to believe that Saama's employees had experience and expertise to deliver the project when in fact they did not.

99.     The Gates Foundation rightfully relied on Saama's statements regarding its employees' skillset and experience.  Relying on these false and misleading statements, the Gates Foundation decided to continue its relationship with Saama for a year and a half.

100.     At the time of reliance, the Gates Foundation did not know that Saama's representations regarding its employees were, in fact, false.

101.     As a result of Saama's material misrepresentations, the Gates Foundation has suffered damages in an amount to be proven at trial.

**Count III**
**Negligent Misrepresentation**

102.     The preceding paragraphs are incorporated by reference.

103.     Saama supplied the Gates Foundation with information that was false in order to prompt the Gates Foundation to issue it work orders.  This false information includes, but is not limited to, (1) incorrect information about employee skills; (2) incorrect information

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1   regarding the scope and timeline of the project; and (3) incorrect information regarding the

2   progress of the project.

3       104.    Saama knew or should have known that the information it had supplied to the

4   Gates Foundation was going to be used by the Gates Foundation to assess whether it should

5   issue additional work orders.

6       105.    Saama was negligent in communicating this false information.

7       106.    The Gates Foundation reasonably relied on the misleading information

8   provided by Saama.

9       107.    The Gates Foundation's reliance on Saama's false information resulted in

10  damages, in an amount to be proven at trial.

**Count IV**
**Professional Negligence**

11

12

13      108.    The preceding paragraphs are incorporated by reference.

14      109.    A company—such as Saama—that undertakes to render services in the practice

15  of a profession is always required to exercise the skill and knowledge normally held by

16  members of that profession in good standing.

17      110.    A technology-based business consulting firm, such as Saama, has the duty to

18  possess and exercise ordinary care and diligence in the application of its professional

19  knowledge.

20      111.    A professional relationship existed between the Gates Foundation and Saama.

21      112.    Saama, a professional, negligently performed the services described in and

22  related to the MSA.

23      113.    Saama's negligence proximately caused significant damages to the Gates

24  Foundation, in an amount that will be proven at trial.

25

26

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Count V**
**Unjust Enrichment**

114.     The preceding paragraphs are incorporated by reference.

115.     Should the Court find that the contract between Saama and the Gates Foundation is void or unenforceable for any reason, the Gates Foundation has an equitable claim against Saama to recover restitution for unjust enrichment.

116.     The Gates Foundation paid Saama approximately $2.8 million.  The Gates Foundation provided this money expecting a working Platform that could be used to share secure data.  Saama failed to provide the Platform.

117.     Saama has been unjustly enriched at the Gates Foundation's expense and should be required to return the Gates Foundation's money.

**Count VI**
**Breach of Duty of Good Faith and Fair Dealing**

118.     The preceding paragraphs are incorporated by reference.

119.     The MSA required Saama to perform its services "in a good and workmanlike manner consistent with industry standards."  The MSA also required Saama to produce a product that was "free from material defects in workmanship" and fit for its intended uses.

120.     The MSA did not provide precise instructions for the creation of the Platform. Saama thus had an implied duty to perform its obligations in a reasonable way that would allow both parties to obtain the fruit of the MSA.

121.     To the extent that Saama actually performed its obligations, the manner in which it did so was cursory, negligent, and otherwise insufficient, such that Saama violated the duty implied in every contract to perform in good faith and allow both parties to realize the benefit of their respective bargains.

122.     As a result of Saama's breach of the implied duty of good faith and fair dealing, the Gates Foundation suffered damages in an amount to be proven at trial.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 19

**Count VII**
**Trademark Infringement Under the Lanham Act - 15 U.S.C. § 1114**

123.    The preceding paragraphs are incorporated by reference.

124.    "The Bill and Melinda Gates Foundation" is a protected trade name and trademark owned by the Gates Foundation.

125.    Saama wrongfully used Foundation's protected trademark without the Gates Foundation's permission, in order to promote, market, or sell Saama's products and services. This wrongful and unauthorized use of the Gates Foundation's mark constitutes trademark infringement pursuant to 15 U.S.C. § 1114.

126.    Saama's wrongful use was an intentional and willful infringement of the Gates Foundation's marks.  The intentional and willful infringement of the Gates Foundation's marks has caused and will continue to cause damage to the Gates Foundation, in an amount to be proven at trial.

127.    The intentional and willful infringement of the Gates Foundation's marks is causing irreparable harm to the Gates Foundation, for which there is no adequate remedy at law.

128.    The Gates Foundation is entitled to recover damages, and to recover its costs, in an amount to be proven at trial.  The Gates Foundation is also entitled to injunctive relief against Saama.

129.    The Gates Foundation is further entitled to recover statutory damages, treble damages, and attorneys' fees.

**Count VIII**
**False Advertisement Under the Lanham Act - 15 U.S.C. § 1125(a)**

130.    The preceding paragraphs are incorporated by reference.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

131.     Saama has used the Gates Foundation's name in commerce, such as on its website, in a manner that misrepresents the relationship between Saama and the Gates Foundation.

132.     Saama's use of the Gates Foundation's name deceives persons into believing that there is an affiliation, connection, association, or sponsorship between Saama and the Gates Foundation.

133.     Saama's unauthorized use of the Gates Foundation's name deceives third persons into believing that the Gates Foundation approves of Saama's goods, services, and commercial activates—when in fact the Gates Foundation has condemned Saama's work.

134.     The Gates Foundation falls within the zone of interests protected by section 1125(a) of the Lanham Act.

135.     Saama's statements have directly and proximately caused injury to the Gates Foundation's reputation and economic standing.

136.     As a result of Saama's wrongful conduct, Saama is liable to the Gates Foundation for violation of 15 U.S.C. § 1125(a) of the Lanham Act.  The Gates Foundation is entitled to damages in an amount to be proven at trial.  The Gates Foundation is also entitled to injunctive relief against Saama.

137.     The Gates Foundation is also entitled to recover attorneys' fees.

## Count IX
## Unfair Business Practices - RCW 19.86.010 *et seq.*

138.     The preceding paragraphs are incorporated by reference.

139.     Saama has an established pattern or practice of promising to provide services it cannot or will not deliver.  Approximately 20% to 25% of its engagements result in delivery problems.

140.     Saama routinely makes false promises regarding the scope, budget and timeline of its services in order to deceive consumers into contracting with Saama.  This

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

routine deception constitutes unfair business practices under the Washington Consumer Protection Act, RCW 19.86.010 *et seq.*

141.     In an effort to further deceive consumers, Saama has misused the Gates Foundation's name to promote, market, or sell Saama's products and services.  The use of the Gates Foundation's name constitutes an unfair business practices under the Washington Consumer Protection Act, RCW 19.86.010 *et seq.*

142.     Saama's deceptions, including but not limited to its routine deception during the "assessment" phase and the misuse of the Gates Foundation's marks, constitute an unfair or deceptive practice occurring in trade or commerce that impacts the public interest and has caused injury to the Gates Foundation.

143.     Saama's unfair business practices have caused and will continue to cause damage to the Gates Foundation, and they are causing irreparable harm for which there is no adequate remedy at law.

144.     Saama's actions violate RCW 19.86.010 *et seq.*, entitling the Gates Foundation to injunctive relief and recovery of its actual damages.  The Gates Foundation is also entitled to treble damages and an award of its attorneys' fees and costs.

## VI.     **PRAYER FOR RELIEF**

WHEREFORE, the Gates Foundation prays for judgment and relief as follows:

(a)   An award of the Gates Foundation's actual damages;

(b)   An award of any punitive damages permitted under the law;

(c)   Restitution of all amounts paid to Saama;

(d)   An award of the Gates Foundation's attorneys' fees and costs;

(e)   Prejudgment and post-judgment interest, to the extent allowed by law;

(f)   Preliminary and permanent injunctive relief against Saama, forbidding it and its officers, agents, representatives, servants, employees, attorneys, successors and assignees,

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022

as well as all others in active concert or participation with Saama (e.g., its investors), from using the Gates Foundation name or marks in association with Saama's services; and

(g)   Such other and additional relief to the Gates Foundation as may be just and proper under the circumstances.

## VII.   JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED this 25th day of September 2017.

K&L GATES LLP

By___ /s/ Robert B. Mitchell_____
      Robert B. Mitchell, WSBA # 10874
By___ /s/ Breanna L. E. Van Engelen_____
      Breanna L. E. Van Engelen, WSBA # 49213
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Tel:      206-623-7580
Fax:      206-623-7022
Email:   rob.mitchell@klgates.com
Email:   breanna.vanengelen@klgates.com

Tamara J. Driscoll, WSBA # 29212
BILL & MELINDA GATES FOUNDATION
500 Fifth Avenue
Seattle, WA 98109
Tel:      206-709-3100
Fax:      206-623-7022
Email:   tamara.driscoll@gatesfoundation.org

*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF- 23

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104-1158
TELEPHONE: +1 206 623 7580
FACSIMILE: +1 206 623 7022